STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

LAUREN M. HARDING (CABN 308029)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6938
    Fax: (415) 436-7234
    Lauren.Harding@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> DAVID ORDONEZ <br><br> and <br><br> JUAN CARLOS HERNANDEZ ORDONEZ, <br><br> Defendants. | CASE NO. 3:22-mj-70489-MAG <br><br> **GOVERNMENT'S MEMORANDUM IN SUPPORT OF DETENTION OF ORDONEZ AND HERNANDEZ-ORDONEZ** |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................................4

BACKGROUND ..................................................................................................................................6

I. Controlled Purchases from David Ordonez (Totaling ~91.2 Grams of Fentanyl and ~101.6 Grams of Methamphetamine) ........................................................................................6

II. Controlled Purchases from Hernandez-Ordonez (Totaling ~61.2 Grams of Fentanyl) ...................7

III. Defendants' Arrests on April 19, 2022 Uncovered Nearly 2.5 Pounds of Fentanyl, Among other Drugs, and Additional Evidence of Drug Dealing......................................................8

IV. Defendants' Prior Arrests and Stay Away Orders for Drug Dealing..............................................8

V. Physical Surveillance and Cell Phone Data Confirms Defendants Routinely Commute from Berkeley to the Tenderloin Together to Sell Drugs .................................................10

LEGAL STANDARD........................................................................................................................10

ARGUMENT .....................................................................................................................................12

I. Defendants Are Subject to a Presumption in Favor of Detention...................................................12

II. Defendants Cannot Rebut the Presumption in Favor of Detention and Should Be Detained As Dangers to the Community. ........................................................................................12

III. Defendants – Who Are Both in the United States Unlawfully and Whose Only Livelihoods Are Illicit Drug Trafficking – Pose Serious Flight Risks. .........................................15

CONCLUSION..................................................................................................................................16

# TABLE OF AUTHORITIES

Page(s)

### CASES

*U.S. v. King*,
   849 F.2d 485 (11th Cir. 1988) ............................................................................................. 12

*United States v. Diaz-Hernandez*,
   943 F.3d 1196 (9th Cir. 2019) .............................................................................................. 11

*United States v. Fulgham*,
   Case No. CR 12–0124 CW (KAW), 2012 WL 2792439 (N.D. Cal. July 9, 2012) ............... 15

*United States v. Hir*,
   517 F.3d 1081 (9th Cir. 2008) .............................................................................................. 11

*United States v. Jessup*,
   757 F.2d 378 (1st Cir. 1985) ........................................................................................... 11, 12

*United States v. Motamedi*,
   767 F.2d 1403 (9th Cir. 1985) .............................................................................................. 11

*United States v. O'Brien*,
   895 F.2d 810 (1st Cir. 1990) ................................................................................................ 11

*United States v. Ward*,
   63 F. Supp. 2d 1203 (C.D. Cal. 1999) .................................................................................. 12

*United States v. Winsor*,
   785 F.2d 755 (9th Cir. 1986) ................................................................................................ 12

*United States v. Wolf*,
   Case No. 5:15-CR-00263-EJD, 2015 WL 4573039 (N.D. Cal. July 29, 2015) .................... 15

### STATUTES

18 U.S.C. § 3142 .................................................................................................................... passim

21 U.S.C. § 841 ............................................................................................................................ 12

21 U.S.C. § 846 ............................................................................................................................ 12

# INTRODUCTION

Nearly every day between 4 and 6 p.m., when most Bay Area workers are ending their workdays, defendants and brothers David Ordonez and Juan Carlos Hernandez-Ordonez commute together from their shared apartment in Berkeley into the Tenderloin to begin their shifts selling fentanyl.[1] On three separate occasions over the past few months, David Ordonez sold a total of approximately 91.2 grams of fentanyl and 101.6 grams of methamphetamine to an SFPD undercover officer. These sales took place on or near Seventh and Market Streets—despite a state court stay-away order (one among three) to stay 150 yards from Seventh and Market Streets. On two separate occasions, Hernandez-Ordonez sold a total of approximately 61.2 grams of fentanyl to an SFPD undercover officer.

Those sales are likely just a fraction of what defendants have sold to others struggling with addiction in the Tenderloin. Cell phone data and physical surveillance show the defendants consistently travel together from Berkeley between 4 and 6 p.m. to the Tenderloin, and return between 2 and 4 a.m. When defendants were arrested leaving their Berkeley apartment at around 4:15 p.m. on April 19— likely en route to "clock in" to their shift selling drugs in the Tenderloin—David Ordonez ran from police and dropped a backpack containing a pharmacy's worth of illicit narcotics, including:

- 1,118.8 grams (or **nearly 2.5 pounds**) of fentanyl;
- 115.1 grams of cocaine base;
- 98.6 grams of methamphetamine;
- 213.4 grams of heroin; and
- 42.9 grams of Xanax pills.

Officers also found several scales inside the backpack. Between the defendants' wallets and apartment, law enforcement seized a total of $4,178 in cash.

Documentation of defendants' drug dealing is not limited to this case. Both defendants were arrested together in January 2022 and found with significant quantities and varieties of drugs (including fentanyl),[2] and David Ordonez has a slew of other arrests for dealing drugs since February 2021. Nearly

---

[1] The Government submits this memorandum in support of its detention motion for each defendant.

[2] This case has since been dismissed in San Francisco Superior Court on Fourth Amendment grounds.

all of their prior arrests and the controlled purchases in this case happened in the same area in the Tenderloin that is known to transform into an illicit drug market at night.[3]

Defendants' chosen "profession" of drug dealing is driving a human tragedy in San Francisco. In 2020 and 2021, approximately 1,300 people died from drug overdoses in San Francisco—nearly twice the number who died from COVID-19 over that same period. About three quarters of those overdose victims—or about 1,000 people—had fentanyl in their systems.[4] The Tenderloin neighborhood, which is also home to families, children, and lawful businesses, is among the hardest hit. The catastrophic effect of drugs, and fentanyl in particular, prompted Mayor London Breed to declare a 90-day state of emergency in the Tenderloin and the surrounding area in late 2021.[5] As the Mayor stated in her announcement, the "rapidly deteriorating conditions in the Tenderloin caused by the opioid crisis put the lives of San Franciscans in serious risk."

Defendants not only pose a substantial and serious risk to San Franciscans—including the lawful residents and businesses *and* those struggling with addiction in the Tenderloin—but also pose a significant flight risk. Indeed, they both ran from officers when they were arrested in this case. And for good reason: not only do they face significant prison time in this case, but both defendants are also unlawfully in the United States from Honduras. Despite Ordonez's representation to pretrial services that he is a United States citizen, he actually faces an outstanding removal order, imposed in absentia in April 2019. Given their young ages (18 and 19), it is doubtful that either defendant has significant ties to the Bay Area or adequate sureties to help ensure their court appearances. Pretrial services' report

---

[3] Mallory Moench & Kevin Fagan, *Drug dealers in the Tenderloin come out in force at night. What can S.F. do to stop the chaos?*, S.F. Chron., Apr. 1, 2022 (https://www.sfchronicle.com/sf/article/Drug-dealers-in-the-Tenderloin-come-out-in-force-17049710.php) (showing how Seventh and Market Streets transforms from 5:53 p.m. into an open drug market at 9:18 p.m.).

[4] Trisha Thadani, et al., *San Francisco's fentanyl crisis: A disaster in plain sight*, S.F. Chron., Feb. 2, 2022 (https://www.sfchronicle.com/projects/2022/sf-fentanyl-opioid-epidemic/).

[5] "Mayor London Breed Declares State of Emergency in the Tenderloin," Dec. 17, 2021 (https://sfmayor.org/article/mayor-london-breed-declares-state-emergency-tenderloin). On December 23, 2021, the San Francisco Board of Supervisors voted to approve Mayor Breed's Emergency Declaration in the Tenderloin. *See* "Board of Supervisors Approves Mayor London Breed's State of Emergency Declaration in the Tenderloin," Dec. 23, 2021 (https://sfmayor.org/article/board-supervisors-approves-mayor-london-breed%E2%80%99s-state-emergency-declaration-tenderloin). The State of Emergency was kept open for 90 days.

confirms as much for Ordonez.[6]  Despite having several interactions with law enforcement, this case will be the first time either defendant risks significant prison time for dealing drugs.  So they have every incentive to run again.

Because the defendants cannot rebut the presumption in favor of detention, *see* 18 U.S.C. § 3142(e)(3)(A), they must be detained pre-trial to ensure the safety of the community and their appearances.

## BACKGROUND

### I. Controlled Purchases from David Ordonez (Totaling ~91.2 Grams of Fentanyl and ~101.6 Grams of Methamphetamine)

As described in more detail in the Complaint, on three separate occasions, David Ordonez sold fentanyl and/or methamphetamine to an undercover San Francisco Police Department ("SFPD") officer ("UC-1").

February 9, 2022:  In the first sale, on February 9, 2022, around 5:20 p.m., Ordonez travelled with Hernandez-Ordonez from their apartment in Berkeley to the Tenderloin, where Ordonez sold $50 of "yellow" (i.e., fentanyl) totaling approximately 2.9 grams (gross) to UC-1.  The sale took place at the corner of Seventh and Market Streets—where Ordonez is subject to a state court stay-away order.  Ordonez provided his phone number to the UC-1 for future sales.  Compl. ¶¶ 18-24.

February 24, 2022:  In the second sale, on February 24, 2022, at around 5:38 p.m., Ordonez was dropped off near the Tenderloin.  Around 6:07 p.m., UC-1 called Ordonez and asked for two ounces of "yellow" (i.e., fentanyl) and one ounce of "crystal" (i.e., methamphetamine).  Ordonez told UC-1 to avoid Seventh and Market Streets because the cops were there.  Around 7:09 p.m., Ordonez sold $1000 of fentanyl totaling approximately 59.7 grams (gross) and $200 of methamphetamine totaling approximately 30.4 grams (gross) to UC-1.  Compl. ¶¶ 25-28.  This sale took place at Stevenson Alley

---

[6] The government has not seen pretrial services report for Hernandez-Ordonez at the time of filing this brief.

and Seventh Street—within 150 yards of Seventh and Market Streets, where Ordonez is subject to a stay-away order.

March 10, 2022: In the third sale, Ordonez reached out to UC-1 and informed him that he had good "fent" and would offer a good price. Later that evening at around 7:12 p.m., Ordonez sold $500 of methamphetamine totaling approximately 71.2 grams (gross) and $500 of fentanyl totaling 28.6 grams (gross)[7] to UC-1. Compl. ¶¶ 29-34. Again, this sale took place at Stevenson Alley and Seventh Street—within 150 yards of Seventh and Market Streets, where Ordonez is subject to a stay-away order.

## II. Controlled Purchases from Hernandez-Ordonez (Totaling ~61.2 Grams of Fentanyl)

Hernandez-Ordonez, too, is following in his brother's footsteps as a Tenderloin drug dealer.

March 9, 2022: In his first sale to an undercover SFPD officer ("UC-2"), on March 9, 2022 around 5:22 p.m., Hernandez Ordonez and Ordonez drove from their shared apartment in Berkeley to San Francisco. Once in the Tenderloin, Hernandez-Ordonez sold $40 worth of "yellow" (i.e., fentanyl) totaling approximately 2.1 grams (net) to UC-2. The sale was interrupted momentarily by an SFPD police car driving nearby. After the sale, Hernandez-Ordonez gave UC-2 his phone number to use for future sales. Compl. ¶¶ 35-42.

March 29, 2022: In the second sale on March 29, 2022, Ordonez and Hernandez-Ordonez again left their shared apartment in Berkeley and drove together to the Tenderloin. Over text message, UC-2 asked Hernandez Ordonez for 2.5 ounces of "yellow." Hernandez-Ordonez responded that he had a "friend." During the sale, Hernandez-Ordonez met with his brother, David Ordonez, to get the drugs he needed to sell to UC-2. Hernandez-Ordonez completed the sale of approximately 59.1 grams (gross) of fentanyl to UC-2 for $1,000 in cash. Compl. ¶¶ 43-51.

---

[7] Using the TruNarc analyzer, the suspected fentanyl tested presumptively positive for the presence of "Fentanyl Compound or Methamphetamine." As described in the affidavit in support of the Complaint, Officer Puccinelli's training and experience supports that it was suspected fentanyl.

Gov. Detention Memo
3:22-mj-70489-MAG
7

### III. Defendants' Arrests on April 19, 2022 Uncovered Nearly 2.5 Pounds of Fentanyl, Among other Drugs, and Additional Evidence of Drug Dealing

On April 19, 2022, at around 4:15 p.m., SFPD officers executed warrants to arrest defendants and search their Berkeley apartment and cars. After defendants exited their apartment, both defendants ran from the police.

As Ordonez ran, he dropped a backpack that he had been wearing. The backpack contained a pharmacy of deadly drugs: 1,118.8 grams (gross) of suspected fentanyl, 115.1 grams (gross) of suspected cocaine base, 98.6 grams (gross) of suspected methamphetamine, 213.4 grams (gross) of suspected heroin, and 42.9 grams (gross) of suspected Xanax pills. There were also several scales and packaging materials in the backpack consistent with selling narcotics.

Searches of their persons found additional indicia of drug dealing. For instance, Ordonez had $2,010 in cash in his wallet and Hernandez-Ordonez had $1,695 in cash in his wallet. During a search of the apartment, officers found an additional $473 in cash under a bed.

### IV. Defendants' Prior Arrests and Stay Away Orders for Drug Dealing

April 19, 2022 was not the first time Ordonez and Hernandez-Ordonez have been arrested together for dealing drugs.

<u>January 17, 2022</u>: On January 17, 2022, SFPD officers detained three individuals, including Ordonez and Hernandez-Ordonez, as part of a traffic stop in the area of Seventh and Howard Streets in the Tenderloin. During a search of a backpack belonging to Ordonez, SFPD officers found 205.6 grams of suspected fentanyl, 21.9 grams of suspected cocaine salt, 13.3 grams of suspected methamphetamine, and 3.7 grams of suspected heroin. During a search of a backpack belonging to Hernandez-Ordonez, SFPD officers found 165.6 grams of suspected fentanyl, 14.2 grams of suspected cocaine salt, 54.6 grams of suspected methamphetamine, and 7.5 grams of suspected heroin.[8]

David Ordonez has several other arrests during which officers found significant quantities and varieties of drugs—all of which occurred in or near the Tenderloin:

---

[8] This case (California Superior Court case no. 220-036-916) has since been dismissed on Fourth Amendment grounds.

February 6, 2021: SFPD officers detained Ordonez's for a traffic-related offense at Seventh and Market Streets in San Francisco. During the search of Ordonez's person, officers seized 2.8 grams of suspected fentanyl, 15.6 grams of suspected methamphetamine, 6.1 grams of suspected cocaine base, and 2.1 grams of suspected heroin. Officers also seized a digital scale and $351 in cash from his person.[9]

May 21, 2021: SFPD officers arrested Ordonez near Seventh Street and Market Street after seeing him engage in two suspected hand-to-hand narcotics transactions with two different subjects. Officers conducted a search incident to arrest of Ordonez and seized the following: 14.5 grams of suspected fentanyl, 6.6 grams of suspected heroin, 14.0 grams of suspected cocaine base, 12.6 grams of suspected methamphetamine. Ordonez was also arrested with a scale and $120 in cash.[10]

July 8, 2021: Ordonez and another person were placed under arrest for facilitating the sale of suspected fentanyl to an SFPD officer acting in an undercover capacity in the area of Seventh Street and Stevenson Alley. During the transaction, the UC saw Ordonez produce multiple bags of suspected fentanyl from his person. During a search of his person, officers found 36.7 grams of suspected fentanyl, 18.8 grams of suspected methamphetamine, and 7.0 grams of suspected cocaine base. Officers also seized $1,444 in cash from his person, along with a digital scale in his left pants pocket.[11]

November 5, 2021: SFPD officers attempted to detain Ordonez for a traffic violation near Seventh Street and Mission Street. When officers ordered Ordonez to stop, Ordonez ran eastbound on Market Street away from the officers. Ordonez ran approximately 120 yards and tucked into a construction alcove at 1028 Market Street. Officers eventually detained him. During a search of

---

[9] This case (California Superior Court case no. 210-084-185) was dismissed in the interest of justice.

[10] This case (California Superior Court case no. 210-311-916) has been referred to the Community Justice Court (CJC) and remains ongoing.

[11] This case (California Superior Court case no. 210-430-005 referred to the Community Justice Court (CJC) and remains ongoing.

Ordonez and the black bag he ditched when he started running, officers seized 121.1 grams of suspected fentanyl, 28.8 grams of suspected methamphetamine, 1.9 grams of suspected cocaine salt, 26.4 grams of suspected cocaine base, 15.7 grams of suspected heroin, and 1.7 grams of suspected Xanax. Officers also seized $1,532.00 of cash from Ordonez's right rear pants pocket.[12]

As a result of these arrests, Ordonez has *three separate* state court stay-away orders: (1) one to stay 150 yards from Seventh and Market Streets until May 2024; (2) a second to stay 150 yards from Seventh and Mission Streets until July 2024; and (3) a third to stay 150 yards from Seventh and Howard until January 2025.

## V. Physical Surveillance and Cell Phone Data Confirms Defendants Routinely Commute from Berkeley to the Tenderloin Together to Sell Drugs

On seven separate occasions, SFPD officers have followed Ordonez and Hernandez-Ordonez from their shared apartment in Berkeley to the Tenderloin District in San Francisco. Data dating back to March 30, 2022 for Ordonez show his cell phone consistently leaves Berkeley between 4 and 6 p.m. and travels into San Francisco, only to return to Berkeley between 2 and 4 a.m. Data dating back to April 5, 2022 show the same pattern for Hernandez Ordonez: his cell phone consistently leaves Berkeley between 4 and 6 p.m. and travels into San Francisco – again only to return between 2 and 4 a.m. Historical cell site data from January 1, 2022 to late March/early April 2022 is also consistent with the duo's routine travel from their Berkeley apartment into the Tenderloin.

## LEGAL STANDARD

The Bail Reform Act of 1984 permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant

---

[12] This case (California Superior Court case no. 210- 727-404) was referred to the Community Justice Court (CJC) and remains ongoing.

is a danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(B). A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *Motamedi*, 767 F.2d at 1406. "[T]he Bail Reform Act mandates an [1] individualized evaluation [2] guided by the factors articulated in § 3142(g)." *See United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Categorical grants or denials of bail, not tethered to an individualized determination, are impermissible. *Id*. Consideration of factors outside the articulated factors set forth in Section 3142 is also disfavored. *Id*.

Where there is probable cause that a defendant has violated the Controlled Substances Act and faces a maximum of 10 years in person or more (as here), courts apply a rebuttal presumption against the defendant that no condition or combination of conditions reasonably will assure the defendant's appearance as required and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A). Under this scheme, the burden of production then shifts to the defendant. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). Although the presumption is rebuttal, it is not a "bursting bubble." *United States v. Jessup*, 757 F.2d 378, 382-383 (1st Cir. 1985) (Breyer, J.), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990). In other words, the presumption is not so weak that if a defendant introduces evidence, "the presumption 'bursts' and totally disappears, allowing the judge (or jury) to decide the question without reference to the presumption." *Id*. (further stating that such an approach would "render the presumption virtually meaningless" because a defendant can "always provide the magistrate with *some* reason" (emphasis added)). Even if the defendant rebuts the presumption, the presumption is not erased; instead, it remains in the case as an evidentiary finding militating against release that is to be weighted along with other relevant factors. *See U.S. v. King*, 849 F.2d 485 (11th Cir. 1988); *accord United States v. Ward*, 63 F. Supp. 2d 1203, 1209 (C.D. Cal. 1999) (citing *Jessup*, 757 F.2d at 389).

If the court concludes that the defendant has rebutted the statutory presumption of detention, the court must consider four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse,

criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

## ARGUMENT

Defendants cannot overcome the presumption in favor of detention. To the contrary, if released pre-trial, they have every incentive to either continue their unlawful (but profitable) business dealing fentanyl in the Tenderloin *or* flee to their home country of Honduras.

### I. Defendants Are Subject to a Presumption in Favor of Detention.

Ordonez is charged with two violations of 21 U.S.C. § 841(a)(1) and (b)(1)(B) for distribution of fentanyl and methamphetamine, each of which carries a maximum penalty of 40 years' imprisonment. Hernandez-Ordonez is charged with one violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) for distribution of fentanyl, also carrying a maximum penalty of 40 years' imprisonment. Both defendants face conspiracy to distribute fentanyl charges, in violation of 21 U.S.C. §§ 846, 841(a)(1), and (b)(1)(B)(vi), which carries the same penalties.

As such, both defendants are subject to a rebuttal presumption in favor of detention. *See* 18 U.S.C. § 3142(e)(3)(A). In order to overcome this presumption, defendants bear the burden to prove *both* that they are not flight risks *and* that their release will not endanger the community. They cannot do so.

### II. Defendants Cannot Rebut the Presumption in Favor of Detention and Should Be Detained As Dangers to the Community.

Defendants' chosen "profession" of dealing fentanyl, among other drugs, is fueling a tragedy outside the courthouse's steps. As Mayor Breed stated in her announcement of the Tenderloin Emergency Intervention Plan, "We are losing over two people a day to drug overdoses, mostly to fentanyl, and mostly in the Tenderloin and SoMa. This is a public health emergency demanding a crisis level response, with massive urgency, coordination, and determination to confront this epidemic."[13]

---

[13] "Mayor London Breed Declares State of Emergency in the Tenderloin," Dec. 17, 2021 (https://sfmayor.org/article/mayor-london-breed-declares-state-emergency-tenderloin).

For defendants, though, this public health emergency is also good business. Just from the five controlled buys in this case, Ordonez earned $2,250 and Hernandez Ordonez earned $1,400. As context, it would take someone earning the minimum wage in San Francisco ($16.07) around 227 hours to lawfully earn the same amount.

There are patterns to defendants' dealing, too. Each sale involved fentanyl. Each sale occurred in the same general area of Seventh and Market Streets in the Tenderloin. And each sale resulted in significant cash flow (totaling $2,250 to Ordonez and $1,400 to Hernandez-Ordonez).

The following charts contextualize the sales that are the subject of the Complaint:

| *Controlled Purchases from David Ordonez* | | | | |
|---|---|---|---|---|
| Date | Drug (Presumptive) | Weight (App'x) | Price | Location of Sale |
| February 9, 2022 | Fentanyl | 2.9 grams (gross) | $50 | Seventh and Market Streets |
| February 24, 2022 | Fentanyl | 59.7 grams (gross) | $1000 | Seventh Street and Stevenson Alley |
| February 24, 2022 | Methamphetamine | 30.4 grams (gross) | $200 | |
| March 10, 2022 | Fentanyl | 28.6 grams (gross) | $500 | |
| March 10, 2022 | Methamphetamine | 71.2 grams (gross) | $500 | |

| *Controlled Purchases from Juan Carlos Hernandez Ordonez* | | | | |
|---|---|---|---|---|
| Date | Drug (Presumptive) | Weight (App'x) | Price | Location of Sale |
| March 9, 2022 | Fentanyl | 2.1 grams (net) | $40 | Seventh and Market Streets |
| March 29, 2022 | Fentanyl | 59.1 grams (gross) | $1000 | |

For Ordonez, these sales took place in the area of Seventh and Market Streets *despite* a stay away order requiring him to stay 150 yards from Seventh and Market Street until May 2024.

Notably, too, these amounts do not include the *additional* drugs – including **nearly 2.5 pounds of fentanyl** – found in the backpack Ordonez was wearing while he and his brother were leaving their Berkeley apartment on April 19, 2022. The quantities and varieties of drugs in the backpack, listed below, erase any question about the brothers' "professions."

| *Drugs Found in Backpack on April 19, 2022* | | | | |
|---|---|---|---|---|
| Date | Drug (Suspected) | Weight (App'x) (Gross) | Price | Location |
| April 19, 2022 | Fentanyl | 1118.8 grams | --- | Outside Berkeley Apartment |
| April 19, 2022 | Cocaine Base | 115.1 grams | | Outside Berkeley Apartment |
| April 19, 2022 | Methamphetamine | 98.6 grams | | Outside Berkeley Apartment |
| April 19, 2022 | Heroin | 213.4 grams | | Outside Berkeley Apartment |
| April 19, 2022 | Xanax | 42.9 grams | | Outside Berkeley Apartment |

As some context to the quantity of fentanyl found in the backpack, the DEA estimates that a mere two milligrams of fentanyl—or 0.002 grams—can be lethal depending on a person's body size, tolerance, and past usage. The fentanyl found in the backpack on April 19, 2022 (totaling ~1118.8 grams) included *559,400 times* that amount of fentanyl.

Defendants' arrests over the past year, too, involved a significant quantity and variety of drugs:

| Date of Arrest | Defendant | Weight (App'x) and Drug (Suspected) | Cash Found | Location of Arrest(s) |
|---|---|---|---|---|
| February 6, 2021 | Ordonez | 2.8 grams fentanyl<br>15.6 grams methamphetamine<br>6.1 grams cocaine base<br>2.1 grams heroin | $351 | Seventh and Market Streets |
| May 21, 2021 | Ordonez | 14.5 grams fentanyl<br>12.6 grams methamphetamine<br>14.0 grams cocaine base<br>6.6 grams heroin | $120 | Seventh and Market Streets |
| July 8, 2021 | Ordonez | 36.7 grams fentanyl<br>18.8 grams methamphetamine<br>7.0 grams cocaine base | $1,444 | Seventh Street and Stevenson Alley |
| November 5, 2021 | Ordonez | 121.1 grams fentanyl<br>28.8 grams methamphetamine<br>1.9 grams cocaine salt<br>26.4 grams cocaine base 15.7 grams heroin<br>1.7 grams Xanax | $1532 | Seventh and Mission Streets |
| January 17, 2021 | Ordonez<br>Hernandez-Ordonez | Ordonez's Backpack:<br>205.6 grams fentanyl<br>13.3 grams methamphetamine<br>21.9 grams cocaine salt<br>3.7 grams heroin<br><br>Hernandez-Ordonez's Backpack:<br>165.6 grams fentanyl<br>54.6 grams methamphetamine<br>14.2 grams cocaine salt<br>7.5 grams heroin | --- | Seventh and Howard Streets |

And it is not as if defendants were innocent bystanders caught in the wrong place at the wrong time during these controlled purchases and arrests. As shown in the above chart, Ordonez has been arrested multiple times for drug-related conduct over the past year and both defendants were arrested together in January 2022 for selling drugs. As noted, Ordonez, too, had a stay-away order to stay 150 yards from Seventh and Market Streets at the time of the controlled purchases in the area.

It is clear that dealing drugs in the Tenderloin is a full-time profession for both defendants. Ordonez's report that he works at "Binito Taller," a body stop in Oakland is both unverified by pretrial services *and* belied by a simple Google search, which shows no body stop in Oakland by that name. The California Department of Employment was also unable to verify any lawful income by Ordonez.

Defendants' "continuing involvement with the distribution of drugs" militates in favor of detention. *United States v. Wolf*, No. 5:15-CR-00263-EJD, 2015 WL 4573039, at *3 (N.D. Cal. July 29, 2015); *United States v. Fulgham*, Case No. CR 12–0124 CW (KAW), 2012 WL 2792439, at *4 (N.D. Cal. July 9, 2012) ("The Senate Report states: The Committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the 'safety of any other person or the community.' Defendant's tendency to repeatedly commit similar crimes shows that he poses an unmitigable danger to the community.").

### III. Defendants – Who Are Both in the United States Unlawfully and Whose Only Livelihoods Are Illicit Drug Trafficking – Pose Serious Flight Risks.

Defendants also pose significant flight risks. Both defendants ran from police when they were arrested on April 19, 2022—and they have every incentive to run again if given the opportunity. For the first time here, defendants are facing real and serious consequences for dealing drugs. They face a mandatory minimum of 5 years' imprisonment for the pending charges *and* potentially a higher 10-year mandatory minimum for the drugs (including ~2.5 pounds of fentanyl) found in the backpack on April 19, 2022. The prospect of a federal conviction and years in federal prison provide defendants with ample motivation to evade these consequences and flee.

Both defendants are also from Honduras and in the United States unlawfully. Ordonez even has an outstanding removal order, imposed in absentia from April 2019. Given their young ages (18, 19), they likely have few meaningful ties to the Bay Area, aside from their customers in the Tenderloin, and

may still have significant ties to their home country. Indeed, Ordonez speaks to his family in Honduras several times a week. Ordonez's most significant tie to the Bay is his brother—who is also a co-defendant in this case. Ordonez's identified surety is a friend of a mere 7-months who herself has only been the community for 1 year and lacks any job. With such tenuous ties to the Bay—and strong ties abroad—Ordonez has every incentive to flee.

At the time of the controlled buys in this case—most of which were in or near Seventh and Market Street—Ordonez also had a court-ordered stay-away orders from Seventh and Market Street. His flagrant violations of that stay-away order signals how he would respect any order from this Court if released.

Finally, this case has also temporarily stripped both defendants of their livelihoods. As noted earlier, Ordonez's stated source of employment is unverified—and there is every reason to believe it is a lie. Stripped of their abilities to profit from addiction, defendants have little incentive to remain in the United States and to answer for their offenses.

## CONCLUSION

No conditions of release will assure the safety of the community or defendants' appearance. The Court should grant the government's motion to detain defendants pending trial.

DATED: April 26, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

*Lauren M. Harding*
LAUREN M. HARDING
Assistant United States Attorney

Gov. Detention Memo
3:22-mj-70489-MAG

16